UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RUFUS WEST,

    Plaintiff,

 v.                    Case No. 06-C-68

GERALD BERGE, GARY BOUGHTON,
PETER HUIBREGTSE, TIMOTHY HAINES,
DR. VINCENT ESCANDELL,

    Defendants.

## DECISION AND ORDER

  On March 2, 2006, Plaintiff Rufus West ("West" or "Plaintiff") filed a § 1983 complaint against correctional officers, supervisors and staff members of the Wisconsin Secure Program Facility ("WSPF"), claiming that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment when he was placed on a Behavior Management Plan ("BMP") for a two-week period in October of 2003. Following the denial of the defendants' summary judgment motions and the appointment of counsel, who added a due process claim, the case proceeded to trial against eight defendants, three of whom were dismissed at the close of the plaintiff's case. On May 27, 2010, after a three-day trial, a jury reached a verdict on the Due Process claim but deadlocked on West's claim that the remaining defendants had subjected him to cruel and unusual punishment. The jury found that the remaining defendants, Warden Gerald Berge, Security Director Gary Boughton, Deputy Warden Peter Huibregtse, Unit Manager Timothy Haines, and Psychologist Vincent Escandell, had violated West's Fourteenth Amendment rights by failing to provide him with notice and an opportunity to be heard, before, during and after his placement on a BMP and

awarded him $1.00 in nominal damages. The jury was unable to reach agreement on the Eighth Amendment claim, however, and therefore did not reach the question of damages.

The defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) both at the close of West's case-in-chief and before the case was submitted to the jury. They also argued that West was limited to an award of only nominal damages, since he had failed to produce any evidence that he suffered a physical injury as a result of the defendants' conduct, and that the evidence did not support an award of punitive damages. The Court took all motions under advisement. After the jury was excused, the defendants renewed their motions for judgment as a matter of law under Fed. R. Civ. P. 50(a) as to the Eighth Amendment claims and moved for judgment notwithstanding the verdict on West's Fourteenth Amendment claim pursuant to Fed. R. Civ. P 50(b). (Dkt. 218.) West filed a brief opposing the motions (Dkt. 219) and the defendants elected not to file a reply brief. (Dkt. 221.) The issues, therefore, are now fully briefed and ready for disposition.

For the reasons set forth below, the defendants' motions will be denied. Sufficient evidence was presented by West that, if believed, would allow a jury to find that the defendants violated West's Eighth and Fourteenth Amendment rights. The jury's verdict on West's due process claim will therefore stand, and a new trial will be scheduled on West's claim that the conditions to which he was subjected on the BMP amounted to cruel and unusual punishment. The defendants' motion seeking a determination that West's damages are limited to nominal damages will also be denied.

**BACKGROUND**

The conduct that gave rise to the BMP was West's refusal to comply with the WSPF's rule that inmates sleep on their beds so that guards making their rounds can complete their checks

without having to enter the cell. The WSPF Program Handbook, which each inmate was provided, contained the following SPECIFIC REGULATION: "Your mattress must stay on your bed at all times. **You must lay on the bed with your head towards the back of the cell.**" (Ex. 43 at 1.) (bold type original). The testimony established that the reason for the rule was to allow guards to safely and readily determine both that the inmate was present in the cell and that he was not in distress. Deputy Warden Huibregtse testified that guards making their rounds at night needed to be able to determine that there was an "actual, living, breathing inmate" in each cell. He recounted several instances over his thirty-some years in corrections, including several recent incidents, where inmates who had covered themselves up with a blanket had managed to kill themselves with no one realizing what they were doing. Requiring inmates to sleep on their beds with their heads toward the back of the cell so that they were visible through the small window on the door allowed the guards to readily determine from the movement of the inmate's chest or upper body both that he was actually there and that he was breathing regularly.

The evidence demonstrated without dispute that West had simply refused to comply with this requirement. Between May 30, 2003 through October 21, 2003, notwithstanding West's claim that he had permission to lie on the floor, WSPF guards documented on Behavior Incident Forms 49 separate incidents in which West was ordered to return his mattress to his bed and refused. (Ex. 772.) During the same period of time, West received fourteen separate Conduct Reports for refusing an order to place his mattress on his bed. (Exs. 24-38.) And although West denied that he ever intentionally hid from the guards, many of the Reports describe West as lying in the middle of the floor of his cell with his upper body and head behind the desk and under the desk where

3

guards were unable to determine whether he was breathing. At times, according to the Behavior Incident Forms, West would arrange his mattress, blanket or files so as to form a tent.

In an effort to induce compliance with what it regarded as a simple but important rule, WSFP authorities had used verbal and written warnings, maintained him on the most restrictive level of WSFP, replaced his regular mattress with a thinner "seg" mattress and finally a seg-smock. He was placed on program segregation and lost his phone, electronics, and canteen privileges. He lost Recreation time and was placed on room confinement. Despite these sanctions, West refused to comply with the rule and at times responded to guards' orders that he return his mattress to his bed with profanity. Unable to obtain his compliance through any other means, the WSPF staff implemented a BMP.

At the time, BMPs were authorized under the WSPF Policies and Procedures Manual. (Ex. 19.) Warden Berge approved the implementation of the policy that defined the use of and review process for BMPs. The policy expressly stated that BMPs were to be used "only when staff counseling, the disciplinary process, and other management techniques have failed to control negative behavior." (*Id.*) BMPs were to be prepared by the Unit Manager for any inmate who persisted in "assaultive, disruptive, or self-injurious behavior and/or acts of sexual misconduct." (*Id.*) Disruptive behavior was defined as "behavior that threatens the security and/or operations of the facility, encourages or incites a disruptive atmosphere, or creates a serious health hazard." (*Id.*)

Under the policy approved by Warden Berge, a BMP was required to include a description and examples of the specific inappropriate behavior to be modified and the actions taken in an attempt to modify it. BMPs included two management conditions to induce compliance: Condition A and Condition B. Under Condition A, which would go into effect upon the inmate engaging in

4

the targeted behavior, the inmate would be placed in his cell with only a security mattress and under shorts. All other property was to be removed, and the security mattress could be removed if the inmate mistreated it. The inmate was denied all privileges (canteen, phone, visiting, programs, etc.) and had no use of nail clippers, razors or cleaning supplies. Although there was running water in the sink, an inmate was not allowed to shower on Condition A unless he remained there for more than three days. Every fourth day, an inmate on Condition A was to be offered a shower and clean undergarments. Unit staff were to provide soap, towel, toothbrush and toothpaste, and retrieve it after use. Only legal mail could be received, and meals were to be served on Styrofoam trays. One blanket was to be provided between 10:00 p.m. and 8:00 a.m. if behavior was appropriate and the inmate returned blanket when directed. While on Condition A, Unit staff were to observe the inmate every thirty minutes and document this information on the BMP log. (*Id.*) In addition, Health Services Unit staff were to see inmates on BMP daily. (*Id.*)

If the inmate refrained from the targeted behavior for three days, the inmate would be progressed to Condition B, where he was subject to the same conditions, except that meals were served on regular trays; the normal shower, laundry, and hygiene schedule was followed; and he received a smock, the use of nail clippers, razors and cleaning supplies, and regular mail delivery. Condition B was to remain in effect from days 4 through 10. Upon successful completion of Condition B, the Unit Manager was to deactivate the BMP and progress the inmate to his appropriate status. In the event he repeated the targeted behavior, the plan would be activated again and the inmate would be placed back on Condition A. The BMP would remain in effect for six months. (*Id.*)

5

Before a BMP could be implemented, it had to be reviewed and signed by each member of the BMP Committee, which consisted of the Deputy Warden (Huibregtse), the Security Director (Boughton), a mental health representative (Escandell), and the Unit Manager (Haines). The inmate was also to sign the Plan. In the event he refused, the refusal was to be noted. The BMP Committee could review the plan and approve modifications at any time, but was required to review the plan for any inmate who remained on Condition A for ten consecutive days. (*Id.*)

On October 21, 2003, the BMP Committee approved a Plan for West. (Ex. 2.) The targeted behavior was described as "sleeping behind your bed, under your desk making it very difficult to see you and verify your health and safety. Disobeying orders to sleep on his bed." (*Id.*) The Condition A sanctions listed in the Plan included (1) in-cell placement with Seg. Smock mattress only; (2) briefs only; (3) blanket from 10:00 p.m. to 8:00 a.m.; (4) Styrofoam meals; (5) no canteen, phone, visitation, mail, clippers, razors, or cleaning supplies; (6) legal access only on case-by-case basis determined by the unit manager; and (7) toilet paper issued as needed by unit staff (7 squares per time). (*Id.*) Defendant Haines testified that on the same day that the BMP was approved, he proceeded to West's cell, read it to him and asked him to sign it. West refused to sign the BMP and simply turned around and returned to his position under his desk on the floor. Haines testified that he then activated the BMP.

Over the next eight days according to the BMP log, West continued to lie on the floor and under his desk and cover himself with his blanket. On October 29, 2003, the BMP was modified so that he was no longer to be given a blanket at night. The modified BMP was again approved by the BMP Committee. Finally, on November 5, 2003, West was moved to Condition B, and on November 11, 2003, he was placed back at his normal status. At that point the BMP was

6

deactivated. Haines and the Correctional Officers under his supervision denied that West had ever complained to them that he was not receiving toilet paper or that he was cold at night. In fact, the defendants introduced testimony that the average temperature of the cells surrounding West's during the time in question exceeded 70 degrees. Haines admitted, however, that during the first few years he was at WSPF, including 2003, inmates regularly complained about their cells being cold and that the prison provided inmates thermal shirts and a second blanket during the colder months of the year.

West's testimony differed markedly from that of Haines and the other WSPF witnesses. West denied that Haines ever read the BMP to him and testified that he only found out about it later from other inmates. He denied that anyone ever told him why he was placed on the BMP or what he needed to do in order to get off it. According to West, he was removed from his cell on October 21, 2003, strip searched, and then returned wearing only his underwear. In the meantime, his cell was cleared of all personal property.

Over the next sixteen days, West testified that the conditions he was subjected to constituted cruel and unusual punishment. He testified that contrary to the BMP, he was denied a "Seg smock mattress" and was forced to sleep on cold hard concrete. Although the BMP log stated otherwise, West testified that he was denied toilet paper his entire time on Condition A and was forced to clean himself with his hands. As a result, he cut himself and suffered rectal bleeding. Since he had no soap, he could not wash his hands, yet had to eat with them because he was denied eating utensils. West also testified he was denied a shower, even on the fourth day on Condition A, as well as toothpaste and a toothbrush. Throughout his time on Condition A, but especially after he was no longer allowed a blanket, he was cold and experienced constant pain and discomfort trying to sleep

7

on the hard concrete surface of his cell. West claimed the conditions were so bad that he seriously considered killing himself, but had no means by which to do so.

## LEGAL STANDARD

Motions for judgment as a matter of law are governed by Federal Rule of Civil Procedure 50. Fed R. Civ. P. 50(a) provides that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Under Fed. R. Civ. P. 50(b),

> [T]he movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

"In entertaining a motion for judgment as a matter of law, a court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). In doing so a court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. *Zimmerman v. Chicago Bd. of Trade,* 360 F.3d 612, 623 (7th Cir. 2004). The court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) citing *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-555 (1990). "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. As applied, then, this Court gives credence to the evidence favoring West as well as that evidence supporting the defendants that is uncontradicted and unimpeached, at least to the extent that such evidence comes from disinterested witnesses. *Id.*

A court may enter judgment as a matter of law even if no verdict was returned. *See Garrett v. Barnes,* 961 F.2d 629 (7th Cir.1992) (fact that two previous trials resulted in hung juries did not preclude entry of judgment as a matter of law at close of evidence in the third trial); see also *Hedgepeth v. Fruehauf Corp.*, 634 F. Supp. 93, 95 (S.D. Miss. 1986), *aff'd*, 813 F.2d 405 (8th Cir. 1987).

**ANALYSIS**

In his Second Amended Complaint and at trial, West claimed he was subjected to cruel and unusual punishment after he was placed on the BMP. West alleged that the defendants, who are all employees of the Wisconsin Department of Corrections, violated his Eighth Amendment rights by exposing him to extremely cold temperatures, denying him clothing and blankets, denying him a mattress, denying him hygiene items and showers, and denying him adequate medical and dental care while he was on the BMP. West also alleged that his Fourteenth Amendment due process rights were violated by the BMP because he was not given a notice and an opportunity to be heard before an atypical and significant hardship was placed on him.

**A. Eighth Amendment Claim**

The Eighth Amendment guards against cruel and unusual punishment which is not part of the formal penalty for a crime. Prison officials have a duty to provide "adequate food, clothing, shelter, and medical care" but "the constitution 'does not mandate comfortable prisons.'" *Farmer v. Brennan,* 511 U.S. 825 at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27(1984). For purposes of the Eighth Amendment, "life's necessities include shelter and heat, . . . . as well as hygiene items." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) (internal cite omitted). "A lack of heat, clothing, or sanitation can violate the Eighth Amendment." *Id.* (citing *Lewis v. Lane*, 816 F.2d 1165 (7th Cir.1987); *see also Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir.1980) ("[A] state must provide ... reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)."); *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir.1981) (confinement in isolation without adequate clothing or bedding supports an Eighth Amendment claim: "clothing is a 'basic necessity of human existence'").

To prevail on his Eighth Amendment claim, West had to prove two things at trial. First, he had to show that the BMP imposed conditions which denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, he had to demonstrate that the defendants knew that West faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). West's testimony, if believed by the jury, is clearly sufficient to support a finding that the conditions to which he was subjected while on Condition A denied him the minimal civilized measure of life's necessities. Indeed, the defendants have not renewed their motion as to Haines presumably because West testified that he complained directly to Haines about the

conditions to which he was actually subjected. The evidence is different with respect to the other defendants, however.

As to Berge, Boughton, Huibrechste, and Escandell, the defendants' argument has greater force. There is no evidence that West ever complained to them. These defendants argue that the evidence was insufficient as a matter of law to support a verdict in West's favor on his Eighth Amendment claim. While they concede that the conditions to which West claimed he was subjected may constitute cruel and unusual punishment, they contend that those were not the conditions that the BMP policy or the specific BMP created for West authorized. West claimed he was denied toilet paper and forced to clean himself off with his hands. The defendants note, however, that the BMP said he was to be given "toilet paper as needed by Unit staff (7 squares per time)." Thus even if one accepts West's claim that, contrary to the BMP log, he was denied toilet paper, they could not be held liable because neither the BMP policy, nor the specific BMP created for West, authorized guards to deny him toilet paper.

It is true that liability under § 1983 cannot be imposed on a defendant who is not personally responsible for the constitutional violation. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("The doctrine of respondeat superior does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'") (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). West argues, however, that the evidence is sufficient to allow a jury to find these defendants liable as supervisors because the conditions they authorized and approved in themselves amounted to a violation of the Eighth Amendment. West also argues that a jury could impose liability upon finding that the defendants turned a "blind eye" to the actual conditions he was forced to endure.

11

West faults the defendants for not taking steps to ensure that the conditions of the BMP they authorized and ordered were being followed.

The failure of the defendants to "check up" on whether Echo Unit staff had properly implemented the BMP is not a basis for imposing liability under the facts of this case. Absent a credible complaint or similar reason to believe otherwise, the supervisory defendants were entitled to assume that the correctional staff were following orders. "Liability [under § 1983] depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Here, West has offered no evidence that any of the defendants other than Haines had any reason to know of his claim that he was not receiving toilet paper contrary to the BMP policy and the specific BMP created for him. If the denial of toilet paper was the only condition on which a jury could base a finding that West was subjected to cruel and unusual punishment, the defendants' argument would have merit.

But West also claimed that the denial of clothing, except for briefs, and later a blanket also constituted cruel and unusual punishment. The denial of these articles was authorized under the general policy approved by Warden Berge and by the specific BMP approved by Haines, Boughton, Huibregtse, and Escandell. And while the defendants introduced evidence that the temperature in West's cell was sufficient so that even without clothes or a blanket, he would not have significantly suffered, West's testimony on the temperature in his cell creates an issue of fact for the jury to decide. The fact that the defendants were all in positions to know of the general conditions within the cells, combined with Haines' testimony that inmates were given thermal shirts and extra blankets during the colder months of the year during this period of time, provides a sufficient basis

12

for a jury to find for West. Accordingly, the motion to dismiss West's Eighth Amendment claim as to all of the remaining defendants will be denied.

**B. Fourteenth Amendment Claim Against All Defendants**

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). To establish a procedural due process violation, a prisoner must first demonstrate that the state deprived him of a liberty or property interest created by state law or the Due Process Clause itself. *See Sandin v. Connor*, 515 U.S. 472, 483-84 (1995). The state has no constitutional obligation to provide an inmate any procedural protection unless it deprives him of a liberty interest. And the mere fact that West was put on the BMP, in and of itself, does not mean he was deprived of a liberty interest, *see Lagerstrom v. Kingston,* 463 F.3d 621 (7th Cir. 2006), because a prisoner has no liberty interest in remaining in the general prison population. *Hewitt v. Helms*, 459 U.S. 460, 467-68 (1983).

This Court instructed jurors that West needed to prove two elements to prevail on his Fourteenth Amendment claim. (Dkt. 215 at 8.) First, West needed to prove that he possessed a liberty interest in remaining on Level 1 at the WSPF and not subject to the restrictions of the BMP. Second, West needed to show that he was not provided an opportunity for a hearing before the BMP was imposed. Defendants presented no evidence on the second element, essentially conceding that West was afforded no hearing prior to the BMP. Thus, at trial, the sole question of whether West's Fourteenth Amendment rights were violated depended on whether West possessed a liberty interest in remaining on Level l of WSPF and in not being subjected to the BMP.

A liberty interest is established by demonstrating that the conditions to which West was subjected under the BMP imposed an "atypical and significant" hardship on him in relation to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 484. In other words, the question for jurors was whether the conditions called for by the BMP resulted in significantly greater hardship for West than the ordinary conditions to which he was subject as an inmate on Level l of WSPF.

Here, the jury found that Warden Berge and all the other defendants violated West's Fourteenth Amendment right to due process. To so find the jury must have concluded that: (1) West received no notice and opportunity to be heard before he was put on the BMP; and (2) the terms of the BMP imposed atypical conditions that subjected West to significant hardship in relation to the ordinary incidents of prison life on Level l at WSPF. (Dkt. 216.) This conclusion is supported by the evidence adduced at trial. The BMP was designed to expose West to some level of discomfort and hardship in order to encourage him to follow the prison rules. By its very terms West's BMP took away privileges that typical prisoners on Level 1 enjoyed. And the BMP policy approved by Warden Berge authorized the implementation of such a plan without first providing the inmate with notice or an opportunity to be heard. Even if the jury did not believe West's testimony that he was never given toilet paper, a reasonable jury could still have concluded that West's BMP conditions authorized under the policy were "atypical and significant" as compared to ordinary prison life on Level 1. Defendants' motion to dismiss West's Fourteenth Amendment claim is therefore denied.

## C. Compensatory and Punitive Damages

Finally, the defendants move for judgment as a matter of law on West's claims for compensatory and punitive damages. They argue that since West produced no evidence of physical

14

injury, he is limited to a nominal damage award of $1.00 pursuant to 42 U.S.C. § 1997e(e). Defendants also argue that the evidence is insufficient to permit an award of punitive damages.

If as West claimed, he complained to Haines of the actual conditions he claims were imposed on him and Haines took no steps to alleviate them, a jury could find a basis to assess punitive damages against him. Likewise, if the jury found that the other defendants knew of the cold conditions West claimed existed in his cell and authorized or directed staff to deny him clothing and bedding, a reasonable jury could assess punitive damages against them as well. The question is far closer on the question of compensatory damages. But since the case must be retried in any event, there is no need to decide that question now. Given the absence of clear Seventh Circuit precedent construing § 1997e(e), I conclude that the more prudent course at this point is to permit the jury to consider West's evidence of physical injury in the event the jury finds a violation.

## CONCLUSION

Accordingly, and for the reasons set forth above, the defendants' Rule 50 motion to dismiss West's Eighth Amendment claim is **denied.** Defendants' motion to dismiss West's Fourteenth Amendment claim notwithstanding the verdict is also **denied.** Defendants' motions for judgment as a matter of law on compensatory and punitive damages are **denied.** The Clerk is directed to set this matter for a telephone conference so that a new trial date can be set for West's remaining Eighth Amendment claim against the defendants.

**SO ORDERED** this   29th   day of September, 2010.

                                                  s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge